# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMERITOX, LTD., <br><br> Plaintiff, <br><br> v. <br><br> MEDYTOX LABS, LLC, and DOES I through X, <br><br> Defendants. | CIVIL ACTION NO. 3:11-CV-1888 <br><br> (JUDGE CAPUTO) |

## MEMORANDUM

Before the Court is a Motion to Vacate Default Judgment filed by Defendant Medytox Labs, LLC ("Medytox"). (Doc. 27.) Medytox argues that the default judgment entered against it is void and should be vacated under Federal Rules of Civil Procedure 55(c) and 60(b)(4) because the Court lacks personal jurisdiction over it. Plaintiff Ameritox, Ltd. ("Ameritox") claims that the Court has personal jurisdiction over Medytox because Medytox employed sales representatives in Pennsylvania. For the reasons that follow, the motion will be granted.

## BACKGROUND

On October 12, 2011, Ameritox commenced this action by filing a Complaint against Medytox and ten Doe Defendants, claiming unfair competition, trademark infringement, and trademark dilution. (Doc. 1.) The Court entered a default against Medytox for failure to plead or defend on February 23, 2012. (Doc. 11.) On May 9, 2012, Ameritox moved for the entry of a default judgment and a permanent injunction against Medytox (Doc. 13); the Court granted the motion on May 30, 2012 (Doc. 15). On November 13, 2012, Ameritox filed a motion requesting the Court to issue a rule to show cause why certain businesses and individuals allegedly related to Medytox should not be held in civil contempt for violating the permanent injunction. (Doc. 18.) On November 15, 2012, the Court issued a Rule to Show Cause ordering the specified parties to appear on December 18, 2012 to show cause why they should not be held in civil contempt for violating the Court's order. (Doc. 22.) On December 6, 2012, Medytox moved to vacate the default judgment entered against it. (Doc.

27.) The motion has been fully briefed and is ripe for disposition.

## **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 55(c), the Court may set aside a default judgment pursuant to Federal Rule of Civil Procedure 60(b), which provides for relief from final judgments on five enumerated grounds—mistake, inadvertence, surprise, or excusable neglect; newly discovered evidence; fraud; the judgment is void; or the judgment has been satisfied, released or discharged—and for "any other reason justifying relief from the operation of the judgment." Although the Third Circuit has a longstanding policy of disfavoring default judgments and encouraging decisions on the merits, *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 245 (3d Cir. 1951), "the decision to vacate a default judgment is left to the sound discretion of the trial court." *Harad v. Aetna Cas. and Sur. Co.*, 839 F.2d 979, 982 (3d Cir. 1988). "In exercising this discretion, however, the court must consider whether vacating the default judgment will visit prejudice on the plaintiff, whether the defendant has a meritorious defense, and whether the default was the result of the defendant's culpable conduct." *Id.* (citing *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984)).

## **ANALYSIS**[1]

Medytox argues that the default judgment entered against it is void because the Court lacks personal jurisdiction over it. (Doc. 28 at 4–9.) Ameritox claims that Medytox had sufficient contacts with Pennsylvania to support personal jurisdiction in this matter. (Doc. 40 at 6–8.) "[O]nce the defendant raises the question of personal jurisdiction, the

---

[1] As a threshold matter, Ameritox argues that Medytox, a LLC that was dissolved by Articles of Dissolution filed with Florida's Secretary of State in August 2012, lacks the legal capacity to seek relief from the default judgment entered against it. (Doc. 40 at 8–10.) However, Florida law provides that a dissolved LLC may carry on business "appropriate to wind up and liquidate its business and affairs," including "[d]ischarging or making provision for discharging its liabilities" and "every other act necessary to wind up and liquidate its business and affairs." FLA. STAT. §§ 608.4431(c), (e). The Court thus finds that Medytox has the legal capacity to seek relief from the default judgment in this matter.

2

plaintiff bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction." *Cartert Sav. Bank, FA v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992) (citations omitted); *see also Packard Press Corp. v. Com Vu Corp.*, 584 F. Supp. 73 (E.D. Pa. 1984).

As discussed above, the Court may relieve a party from a final judgment if it is void. Fed. R. Civ. P. 60(b)(4). "A judgment is void within the meaning of Rule 60(b)(4), if the court that rendered it lacked personal jurisdiction over the defendant." *Budget Blinds, Inc. v. White*, 536 F.3d 244, 258 (3d Cir. 2008) (citing *Marshall v. Bd. of Ed., Bergenfield, N.J.*, 575 F.2d 417, 422 (3d Cir. 1978)). However, "[f]ederal courts considering Rule 60(b)(4) motions that assert a judgment is void because of a jurisdictional defect generally have reserved relief only for the exceptional case in which the court that rendered judgment lacked even an 'arguable basis' for jurisdiction." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010).

District courts are permitted to exercise personal jurisdiction over a nonresident to the extent allowed under the laws of the state where the district court sits. Fed. R. Civ. P. 4(e). Two inquiries are required in determining whether jurisdiction exists over an out-of-state defendant: "[f]irst, the court must apply the relevant state long-arm statute to see if it permits the exercise of personal jurisdiction; then, the court must apply the precepts of the Due Process Clause of the Constitution." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998). As Pennsylvania's long-arm statute extends to the limits of due process, 42 PA. CONS. STAT. § 5322(b), the two tests collapse into a due process inquiry.

Such due process requires that an out-of-state defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Due process also requires some voluntary action by the defendant; this action serves as "fair warning that a particular activity may subject [it] to the jurisdiction of a foreign sovereign."

3

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citations omitted).

Having the requisite minimum contacts with the forum state may subject the defendant to either general jurisdiction or specific jurisdiction. General jurisdiction allows a court to "hear any and all claims against [a party] when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations v. Brown*, 131 S. Ct. 2846, 2851 (2011) (citing *Int'l Shoe*, 326 U.S. at 317). The hallmark of general jurisdiction are "continuous and systematic" contacts with the forum state, even where the cause of action is unrelated to those contacts. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 (1984).

Conversely, specific jurisdiction "arises out of" or "relates to" the cause of action when the contacts are "isolated or specific." *Burger King*, 471 U.S. at 472–73. It depends not on an entity's overall vulnerability to suit in a form, but "on an 'affiliatio[n] between the forum and the underlying controversy,' principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 131 S. Ct. at 2851 (citing von Mehren & Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis*, 79 HARV. L. REV., 1121, 1136 (1966)).

**A. General Jurisdiction**

"When the cause of action does not arise out of or relate to the foreign corporation's activities in the forum State, due process is not offended by a State's subjecting the corporation to its *in personam* jurisdiction when there are sufficient contacts between the State and the foreign corporation." *Helicopteros*, 466 U.S. at 414. "A court may exercise general jurisdiction over a defendant whether he or she has 'continuous and systematic' contacts with the forum, whether or not those contacts are related to the plaintiff's cause of action." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 334 (3d Cir. 2009) (citing *Helicopteros*, 466 U.S. at 416). "In considering general jurisdiction, we must look to all defendants' contacts, which must be 'extensive and pervasive' . . . ." *Lolli v. Parc Mgmt., LLC*, No. 11–1372, 2012 WL 688475, at *3 (M.D.

4

Pa. Mar. 2, 2012). Thus, "[t]he standard for evaluating whether minimum contacts satisfy the test for general jurisdiction is more stringent than the test applied to questions of specific jurisdiction." *Saudi v. Acomarit Maritime Servs., S.A.*, 114 F. App'x 449, 453 (3d Cir. 2004) (citing *Noonan v. Winston Co.*, 135 F.3d 85, 93 (1st Cir. 1998)).

*Helicopteros Nacionales de Colombia v. Hall* considered whether a Texas state court could exercise jurisdiction over a Colombian corporation, Helicol, for the crash of one of its helicopters in Peru. 466 U.S. 408, 409 (1984). Helicol's combined contacts with the Texas forum included "sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from [a Texas corporation] for substantial sums; and sending personnel to . . . Fort Worth for training." *Id.* at 416. These contacts were not trivial; the helicopters purchased in Texas constituted 80% of Helicol's fleet and constituted more than four million dollars of commerce over the seven year period preceding the accident. *Id.* at 411. Still, the United States Supreme Court held that these contacts did not "constitute the kind of continuous and systematic general business contacts" necessary for general jurisdiction. *Id.* at 412. In finding as much, the Court promulgated a long list of considerations it found relevant to a lack of jurisdiction:

> Helicol never has been authorized to do business in Texas and never has had an agent for the service of process within the State. It never has performed helicopter operations in Texas or sold any product that reached Texas, never solicited business in Texas, never signed any contract in Texas, never had any employee based there, and never recruited an employee in Texas. In addition, Helicol never has owned real or personal property in Texas and never has maintained an office or establishment there. Helicol has maintained no records in Texas and has no shareholders in that State.

*Id.* at 411.

According to declarations submitted by Dr. Thomas Mendolia, who was a member of Medytox from its formation in January 2011 to its voluntarily dissolution in August 2012, Medytox was a Florida limited liability company with a principal address in Florida. (Doc. 27, Ex. 1 at ¶¶ 1, 3–4.) Medytox did not have an office for service of process in

5

Pennsylvania and had not otherwise consented to jurisdiction or venue in Pennsylvania. (*Id.* at ¶ 5.) It never maintained an office or place of business in Pennsylvania, had any employees in Pennsylvania, or solicited business in Pennsylvania. (*Id.* at ¶¶ 7–9.) Medytox never contracted with or entered into negotiations with any Pennsylvania entities or residents, nor did it reach out to any Pennsylvania residents or entities by e-mail or telephone. (*Id.* at ¶¶ 10–11, 20.) It never owned any real estate or real property in Pennsylvania, sold or supplied any goods in Pennsylvania, shipped products through Pennsylvania, advertised in Pennsylvania, or bought goods from a supplier in the state. (*Id.* at ¶¶ 13–19.) Although Medytox hosted and maintained a website, it was solely informational and was not used to facilitate commercial activity. (*Id.* at ¶ 21.)

Nevertheless, Ameritox alleges that Medytox's activities within the forum, which allegedly include employing sales representatives to work in western and northeastern Pennsylvania, sufficiently form the basis for general personal jurisdiction.

### 1. Patrick O'Shea

In support of its contention that the Court has personal jurisdiction over Medytox, Ameritox has submitted a declaration from Christina Button, a registered nurse. (Doc. 41 at ¶ 1.) She states that in August 2011, she was visited at her place of employment, Advanced Pain Management Specialists ("Advance Pain") in Clarks Summit, Pennsylvania, by Patrick O'Shea, a sales representative who claimed to represent Medytox. (*Id.* at ¶¶ 2, 4–5.) O'Shea sought a meeting with Dr. Avner Griver for the purpose of selling Medytox's clinical laboratory testing services for pain medication monitoring to the practice. (*Id.* at ¶ 4.) He left his business card, which identified him as a Medytox representative, at the office and later arranged a meeting with Dr. Griver. (*Id.* at ¶¶ 5–6.) At a subsequent office visit, O'Shea left promotional documents concerning Medytox's laboratory testing services. (*Id.* at ¶ 7.) Although Dr. Griver initially agreed to provide urine test samples to Medytox on a trial basis in order to assess their services,

he ultimately decided that no samples would be sent to Medytox.² (*Id.* at ¶¶ 6, 9.)

In response, Dr. Mendolia reaffirms in a declaration that Medytox never solicited business in Pennsylvania, employed a sales representative in Pennsylvania, or had any of its employees visit Pennsylvania. (Doc. 46, Ex. A at ¶ 36.) He states that Medytox did not employ O'Shea and provides Medytox's official business and financial records, which do not show any payments to O'Shea. (*Id.* at ¶ 37.) Dr. Mendolia asserts that O'Shea was employed by Medytox Medical Management Solutions Corp. ("Medytox Medical"), a separate and distinct corporate entity, from June 2011 to December 2011.³ (*Id.* at ¶¶ 38–39.) He further contends that the documents that O'Shea left at Advance Pain, which Button and Piccotti submitted along with their declarations, are plainly labeled as Medytox Medical materials and not as Medytox materials. (*Id.* at ¶ 40.)

The Court agrees with Medytox. The evidence shows that O'Shea was employed as a sales representative by Medytox Medical, a separate legal entity that is distinct from Medytox. Medytox's financial records do not show any payments made to O'Shea, and Medytox's name does not appear on the promotional and instructional literature left at Advance Pain. Instead, the documents are clearly and repeatedly marked with Medytox Medical's name and logo. Ameritox has not sufficiently demonstrated that O'Shea's visits to Advance Pain warrant the Court exercising personal jurisdiction over Medytox.

---

² Ameritox has also submitted the declaration of Linda Piccotti, its sales consultant for northeastern Pennsylvania. (Doc. 42 at ¶¶ 1–2.) In August 2011, Button told Piccotti that Advanced Pain, which was an Ameritox client, had been approached by O'Shea, who sought to acquire urine testing business from the practice on behalf of Medytox. (*Id.* at ¶¶ 2–4.) Advance Pain gave Piccotti the Medytox documents left at their office by O'Shea, and she later spoke with Dr. Grivner about his interactions with O'Shea. (*Id.* at ¶¶ 4–5, 8.)

³ Dr. Mendolia also provides a copy of the LinkedIn profile of Patrick O'Shea, a sales representative from the Allentown, Pennsylvania area. (Doc. 46, Ex. A.) In his profile, O'Shea indicates that he worked as a sales representative for Medytox Medical Management Solutions Corp. from June 2011 to December 2011. (*Id.*) He also states that this position entailed selling "urine toxicology lab services" and focusing on "pain specialists and drug treatment centers." (*Id.*)

### 2. Richard McCullough

Ameritox has also submitted the declaration of Richard McCullough, who has worked in the medical testing field for approximately thirty years. (Doc. 43 at ¶ 1.) McCullough states that Medytox engaged him to sell its testing services from September 2011 until his resignation in February 2012; he reported to Medytox's Director Sales, Edward Klapp, while employed there. (*Id.* at ¶¶ 2, 9.) He asserts that Medytox sent him to Pittsburgh, Pennsylvania in late 2011 to sell its services; during his four-day trip, he made sales calls for Medytox at approximately fourteen clinics or doctor's offices. (*Id.* at ¶¶ 3–4.) McCullough claims that during the same time period, Klapp traveled to Philadelphia, Pennsylvania to sell Medytox's services to potential clients in Pennsylvania and New Jersey. (*Id.* at ¶ 5.) He also states that during his tenure with Medytox, he established Revscreen, LLC ("Revscreen"), a company through which he recruited approximately ten individuals, whose names he cannot recall, to work as sales representatives for Medytox in Pennsylvania and other places. (*Id.* at ¶¶ 6–7.) McCullough further asserts that after these individuals completed three hours of online training, which was required by Medytox, they made sales calls on Medytox's behalf in western Pennsylvania and other parts of the state. (Doc. 43 at ¶¶ 7–8.)

Dr. Mendolia, in response, states in a declaration that McCullough was never employed by or affiliated with Medytox. (Doc. 46, Ex. A at ¶¶ 27–28.) He also asserts that McCullough never served as a sales representative for Medytox or made any sales calls on its behalf in Pennsylvania. (*Id.* at ¶¶ 27, 29.) Dr. Mendolia denies McCullough's statement that Klapp had traveled to Philadelphia in October 2011 to make sales calls on Medytox's behalf; Klapp never traveled to Pennsylvania to represent Medytox, was never part of Medytox's sales team, and had not been a member of Medytox since February 2011. (*Id.* at ¶¶ 8, 30–31.) He also denies McCullough's statements regarding Revscreen, countering that Medytox never had any relationship with Revscreen or any sales representatives employed by Revscreen, and neither Revscreen nor any of its

8

sales representative made any sales calls in or into Pennsylvania on Medytox's behalf.[4] (*Id.* at ¶¶ 32–33.) He also provides Medytox's official business and financial records, which do not show any payments made to McCullough or Revscreen. (*Id.* at ¶¶ 28, 33.)

The Court also agrees with Medytox on this point. The evidence here does not show that Medytox had any relationship with McCullough, Revscreen, or any sales representatives employed by Revscreen. The Court is unconvinced that McCullough, Klapp, or sales representatives employed by Revscreen made in-person or telephonic sales calls to individuals or business entities in Pennsylvania on behalf of Medytox. Ameritox has not met its burden of demonstrating that these alleged activities permit the Court to exercise personal jurisdiction over Medytox.

Assuming, *arguendo*, that Ameritox had shown by a preponderance of the evidence that Medytox's alleged contacts with Pennsylvania occurred, none of the contacts, taken separately, are significant enough to confer the basis of general jurisdiction. And, taken together, they are not "continuous and systematic." As such, there is a lack of general jurisdiction over Medytox in the instant case.

### B. Specific Jurisdiction

The Third Circuit employs a three-part analysis for specific personal jurisdiction. For specific jurisdiction to exist, it must be true that: (1) the defendant "purposefully directed [its] activities" at Pennsylvania, (2) the litigation "arise[s] out of or relate[s] to" at least one of the defendant's activities in Pennsylvania, and (3) the exercise of jurisdiction

---

[4] Medytox also submits a declaration from William Forhan, CEO of Medytox Solutions, Inc. ("Medytox Solutions"), who states that McCullough lacks credibility here because he is motivated by animosity against Medytox, Medytox Solutions, and individuals he believes to be associated with those entities. (Doc. 46, Ex. B at ¶¶ 1, 9.) Forham asserts that Medytox Solutions had discussions with McCullough about a possible business relationship but decided against it. (*Id.* at ¶ 10.) He further states that McCullough then began defaming and harassing Medytox Solutions and its executives, which led the company to seek a preliminary injunction against him in Florida state court in June 2012. (*Id.* at ¶¶ 8, 11, 21.) In July 2012, the Florida court enjoined McCullough from contacting all Medytox Solutions employees and interfering with the company's relationships with current and prospective business partners. (*Id.* at ¶ 22.)

comports with traditional notions of "fair play and substantial justice." *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007) (citations omitted). In actions where multiple claims are asserted, specific jurisdiction is claim-specific because "a conclusion that the District Court has personal jurisdiction over one of the defendants as to a particular claim . . . does not necessarily mean that it has personal jurisdiction over that same defendant as to [the plaintiff's] other claims." *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001).

The threshold inquiry for specific personal jurisdiction considers whether the defendant has "'purposefully avail[ed] itself of the privilege of conducting activities within the forum.'" *O'Connor*, 496 F.3d at 318 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "[W]hat is necessary is a deliberate targeting of the forum. Thus, the 'unilateral activity of those who claim some relationship with a nonresident defendant' is insufficient." *Id.* (quoting *Hanson*, 357 U.S. at 253). Specific jurisdiction is established when "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

While "the Supreme Court has not yet explained the scope of the [arises out of or related to] requirement," the Third Circuit has concluded that the "relatedness requirement's function is to maintain balance in this reciprocal exchange. In order to do so, it must keep the jurisdictional exposure that results from a contact closely tailored to that contact's accompanying substantive obligations." *O'Connor*, 496 F.3d at 318–24.

In support of its argument that the Court has specific jurisdiction over Medytox in this matter, Ameritox points to the same alleged contacts that O'Shea, McCullough, Klepp, and Revscreen sales representatives had with Pennsylvania on Medytox's behalf. However, as discussed more fully above, Ameritox has not met its burden of proving by a preponderance of the evidence that any these alleged contacts actually occurred. Thus, as Ameritox has not shown that Medytox had any contacts with Pennsylvania or purposefully availed itself of the privilege of conducting activities in the state, the Court

10

cannot find that it has specific jurisdiction over Medytox here.

As the Court lacks personal jurisdiction—general or specific—over Medytox, the default judgment entered against it is void. *See Budget Blinds*, 536 F.3d at 258. Because there is not even an arguable basis for jurisdiction over Medytox, the Court will exercise its discretion and grant Medytox's Motion to Vacate Default Judgment (Doc. 27). The Court finds that vacating the default judgment against Medytox will not visit prejudice, as "[d]etriment in the sense that the plaintiff will be required to establish the merit of its claims does not constitute prejudice." *Accu-Weather, Inc. v. Reuters Ltd.*, 779 F. Supp. 801, 802 (M.D. Pa. 1991) (citations omitted). The Court also finds that Medytox has a meritorious defense: that the Court lacks personal jurisdiction over it. Finally, the Court finds that Medytox did not engage in culpable conduct here, as its failure to respond to the suit was not the product of bad faith or "reckless disregard of repeated communications," *Hritz v. Woma Corp.*, 732 F.2d 1178, 1183 (3d Cir. 1984), but rather of its former counsel's legal advice that it was not subject to personal jurisdiction in Pennsylvania (Doc. 46, Ex. A at ¶¶ 17–18).

## **CONCLUSION**

Because the Court lacks personal jurisdiction over Medytox, the default judgment entered against Medytox is void and the Motion to Vacate Default Judgment (Doc. 27) will be granted. Accordingly, Ameritox's Complaint against Medytox is dismissed for want of personal jurisdiction. An appropriate order follows.

June 20, 2013  /s/ A. Richard Caputo
Date  A. Richard Caputo
 United States District Judge